## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MSP Small Business Concessions Alliance, | No. 24-cv-3764 (KMM/SGE) |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| Metropolitan Airports Commission, | |
| Defendant. | |

Metropolitan Airports Commission ("MAC"), a municipal corporation that operates the MSP International Airport, adopted a policy that imposes certain conditions on businesses leasing retail space in the airport to sell concessions. Under the policy, if a labor organization representing the concessionaires' employees contacts the business to negotiate a labor agreement, sometimes that agreement, known as a "labor peace agreement" must include terms that prevent the employees from engaging in activities such as picketing, strikes, work stoppages, and boycotts. If the concessionaire and the labor organization cannot reach an agreement, the policy requires that their dispute be submitted to binding arbitration, and the arbitrator is empowered to fashion the terms of a labor peace agreement resembling the terms of similar agreements in the private sector in the Twin Cities metropolitan area.

In September 2024, the Plaintiff, MSP Small Business Concessions Alliance, an association of small concessions businesses, filed this lawsuit against MAC alleging that the labor policy violates its members' First Amendment rights, is preempted by the

National Labor Relations Act, and violates federal law in other ways. MAC moves to dismiss Plaintiff's claims for lack of standing and failure to state a claim. For the reasons that follow, the Court agrees that this case must be dismissed.

## THE COMPLAINT

### I.    MAC's Labor Peace Agreement Requirement

MSP Small Business Concessions Alliance ("MSBCA") is a trade association representing the interests of small businesses that provide concessions at the Minneapolis-St. Paul International Airport ("the Airport"). MSBCA's members enter contracts with MAC to lease space to operate within the Airport. MAC is a public corporation established in 1943 by the Minnesota Legislature. MAC owns and operates the Airport. MAC uses concessionaires' rent and fees, along with other revenue generated at the Airport to fund the Airport's operations.

MSBCA brings this action seeking declaratory and injunctive relief based on MAC's policy requiring concessionaires to agree to enter into labor peace agreements as a condition of receiving a commercial lease at the Airport. Specifically, on September 16, 2020, MAC revised three of its concessions policies entitled "Awarding Concession Agreements." The revision is commonly referred to as the Labor Peace and Worker Retention Policy ("the Policy"). The Policy applies to concessions businesses with at least 75 full-time employees.

The Policy explains that MAC awards concessions "by either a Request for Proposal process (RFP), a Bid Process, or a Direct Negotiation." Anderson Aff., Ex. A,

MAC Policy 10001 at 2.[1] When developing a concession, MAC first determines what type of concession is needed in the Airport; then it decides whether to use the RFP, Bid Process, or Direct Negotiation approach; and finally it selects, evaluates, and awards concessions according to a set of procedures. *Id.* at 3. The Policy provides that MAC awards concessions using a three-phase process: (1) the Planning and Development Phase, (2) the Issuance Phase, and (3) the Evaluation and Award Phase. *Id.* at 4.

In the Planning and Development Phase, after initial determinations have been made about the type of concession needed at the Airport, MAC staff will request authorization from MAC to issue an RFP or a Request for Bid ("RFB"). *Id.* at 6. When making such a request, staff members provide a memo to MAC that includes "the key business terms of the concession opportunity." *Id.* at 6–7. Among other aspects of the memo, the Policy states:

> MAC staff shall include its analysis and a recommendation of whether to include a labor peace agreement requirement in a memorandum to the [responsible MAC committee] when seeking approval to issue the RFP/RFB. If approved/directed by [MAC], the labor peace requirement as shown in Exhibit A-1 shall be included in the RFP/RFB and resulting Concession Agreement.

---

[1] Although a copy of the Policy was not attached to the Complaint, MAC provided one to the Court in connection with its motion to dismiss. The Policy is properly before the Court because it is embraced by the pleadings and MSBCA does not dispute its authenticity. *Hughes v. City of Cedar Rapids, Iow*a, 840 F.3d 987, 998 (8th Cir. 2016) (cleaned up).

*Id.* at 7. MAC staff considers nine specific criteria in determining whether including a labor peace requirement in the RFP/RFB and resulting Concession Agreement is in the best interest of MAC.[2] *Id.*

MAC attaches a "Labor Peace Agreement Requirement" to the Policy that it sends out with an RFP or RFB if it determines that doing so is in its best interests. *Id.* at 14. This provision states that a "[c]oncessionaire is required to expeditiously negotiate a Labor Peace Agreement upon written notice from a labor organization representing or seeking to represent the employees of Concessionaire who are performing work at [the Airport]." *Id.* MAC requires the Labor Peace Agreement to be in writing between the Concessionaire and Labor Organization, and it must "contain binding and enforceable terms prohibiting Labor Organization, its members and the Employees in the case of a collective bargaining agreement, from engaging in picketing, strikes, work stoppages, boycotts or any other forms of economic interference on [Airport] property or which is otherwise related to the provision of goods or services to the MAC or at [the Airport]." *Id.*

If the Concessionaire and Labor Organization are unable to agree on the terms of a Labor Peace Agreement, then they are required to engage a mediator to help them resolve

---

[2] MAC considers the need for the concession at the airport; the prevalence of unionization in the marketplace; the history of labor disputes; how much a work stoppage might impact the MAC and travelers using the airport; how much rent MAC collects or could collect from the desired concession; financial implications for MAC; whether requiring a labor peace agreement would hinder competition in the bidding process; how imposing the requirement would affect Airport Concessions Disadvantaged Business Enterprises (ACBDEs) and small businesses in the bidding process; and other impacts on MAC's strategic plan goals. MAC Policy 10001 at 7.

their dispute within 45 days of the Labor Organization's initial request. *Id.* If their dispute

is unresolved within 15 days of their initial mediation session, then the Concessionaire

and the Labor Organization must participate in binding arbitration. *Id.* Once the parties

have submitted their positions to the arbitrator, the arbitrator shall:

> Fashion the terms of a Labor Peace Agreement similar to those occurring in the private sector in the Twin Cities metropolitan area or which otherwise serve the proprietary interests of the MAC in ensuring that there are no strikes, work stoppages, picketing, boycotts or other economic interference on MSP property or which is otherwise related to the provision of goods or services to the MAC or at MSP[.]

*Id.* A "[c]oncessionaire may continue to operate at [the Airport] during any negotiation,

mediation or arbitration relating to a Labor Peace Agreement[.]" *Id.*

MSBCA's lawsuit focuses on the fact that the Policy requires any arbitrator to set

the terms of a labor peace agreement that are like private sector agreements in the Twin

Cities area. Specifically, MSBCA alleges that "[l]abor peace agreements in the Twin

Cities metropolitan area customarily include a so-called 'Neutrality Agreement,'" which

provides that "an employer is required to remain neutral during a union organizing

campaign." Compl. ¶¶ 25–26. Such a Neutrality Agreement allegedly "prevents

employers from speaking to employees concerning the benefits or detriments of

unionization, thereby serving as a viewpoint-based limitation on speech." *Id.* ¶ 26.

MSBCA claims that the Labor Policy violates its members' First Amendment

rights by requiring the concessionaires to adopt neutrality agreements that restrict their

speech based on the viewpoints they wish to express. Compl. ¶¶ 43–49 (Count I). In

addition, MSBCA asserts that the Policy violates the National Labor Relations Act by

requiring Plaintiff's members to maintain neutrality. Compl. ¶¶ 50–63 (Count II).

Specifically, MSBCA claims that requiring a neutrality agreement violates 29 U.S.C.

§ 158(c), which provides that "[t]he expressing of any views, argument, or opinion, or the

dissemination thereof, . . . shall not constitute or be evidence of an unfair labor

practice. . ., if such expression contains no threat of reprisal or force or promise of

benefit." *Id.* ¶ 53. And MSBCA asserts that the Labor Policy's requirement for

concessionaires to enter labor peace agreements with labor organizations violates Section

302 of the Labor-Management Relations Act, 29 U.S.C. § 186(a)(2). Compl. ¶¶ 72–79

(Count IV). Section 302 makes it unlawful for "any employer . . . to pay, lend, or deliver,

any money or other thing of value . . . to any labor organization, or any officer or

employee thereof, which represents, seeks to represent, or would admit to membership,

any of the employees of such employer." Compl. ¶ 73 (quoting 29 U.S.C. § 186(a)(2)).

MSBCA claims that labor peace agreements violate this provision when the agreements

have value and constitute a payment or delivery to the labor organization, and MAC's

Labor Policy's labor peace agreements do just that. *Id.* ¶¶ 75–77.

## II.    The ACDBE Program

In addition to those three claims, MSBCA alleges that MAC's Policy violates the

Federal Aviation Administration's Airport Concessions Disadvantaged Business

Enterprise ("ACDBE") program under 49 C.F.R. § 23.[3] Compl. ¶¶ 64–71. According to

---

[3] MSBCA alleges that MAC is self-funded and uses rents and fees paid by airport users and businesses to fund operations at the Airport. Compl. ¶ 11. However, MAC also receives federal funds annually to operate and make capital improvements to the Airport, which subjects it to the ACDBE program. *Id.*

MSBCA, the Policy unlawfully targets women and minority-owned businesses that are certified under the ACDBE program. *Id.* ¶ 1. An ACDBE is a for-profit business that is at least 51% owned and controlled by members of various ethnic or racial minority groups or women. *Id.* ¶¶ 17–18. Many of MSBCA's members are certified as ACDBEs that participate in and benefit from the ACDBE program. *Id.* ¶ 21.

The ACDBE program applies principally to airport concessions-related work, and the procurement of goods, supplies, and services at the Airport and other airports around the country. *Id.* ¶ 16. "The primary purpose of the program is to 'remove barriers' and 'level the playing field' by providing small businesses – owned and controlled by socially and economically disadvantaged individuals – a fair opportunity to compete for federally-funded transportation contracts." *Id.* ¶ 14. Under the ACDBE program, an airport operator like MAC, "must meet the non-discrimination requirements . . . with respect to the award and performance of any concession agreement, management contract or subcontract, purchase or lease agreement, or other agreement covered by" the governing regulations. *Id.* ¶ 19 (quoting 49 C.F.R. § 23.9(a)).

But MAC's Policy allegedly targets ACDBEs, and MAC knew it would harm MSBCA and its members when it adopted the Policy. *Id.* ¶ 33.

> To assess the impact of the Labor Policy on small minority- and women-owned businesses, MAC staff contacted other large airports to determine what the impact on those businesses were from similar labor peace policies. MAC staff informed the Commission that those airports reported additional challenges for small minority- and women-owned businesses, and decreased participation of small minority- and women-owned businesses in some instances. Likewise, MAC staff informed the Commission that small minority- and women-

> owned businesses expressed concerns regarding the increased administrative costs to become knowledgeable in working with labor agreements and how it negatively affects their ability to bid and compete with companies that are substantially larger and already equipped to deal with these new administrative complexities and costs. Finally, MAC staff has informed the Commission that including labor peace requirements in requests for proposal could potentially decrease ACDBE and small business participation.

*Id.* ¶ 33.

According to the Complaint, both MSBCA and "a coalition of Minnesota area chambers of commerce (collectively, the 'Chamber Coalition') . . . informed MAC that the labor peace policy would impede entrance to the market and hurt current small, minority, and women-owned operations." *Id.* ¶¶ 34–35. Sixteen separate ACDBEs at the Airport "wrote a letter to MAC explaining . . . why the labor peace agreement provision would be devastating for their businesses and other prospective small businesses." *Id.* ¶ 36. MAC staff has also "informed the Commission that the Labor Policy harms ACDBEs," and may interfere with ACDBE growth and access to concessions opportunities at the Airport. *Id.* ¶ 37. Meanwhile, most of the concessions at the Airport are currently operated by large national and international companies that are already parties to collective bargaining agreements or labor peace agreements, while the remaining smaller businesses that are not already parties to such agreements are those owned and operated by women and minorities. *Id.* ¶ 38. According to MSBCA, the Policy "intentionally targets Plaintiff's members under the guise of requiring all Airport concessionaires with more than 75 full time employee equivalents to enter into labor peace agreements and therefore constitutes active discrimination." *Id.* ¶ 40.

Plaintiff claims that MAC has not taken the necessary steps to ensure nondiscrimination in awarding and administering its contracts in violation of 49 C.F.R. § 23.9(b). *Id.* ¶ 66 (Count III). MSBCA alleges that applying the Policy's labor peace agreement requirement to ACDBEs lacks any legitimate business purpose. *Id.* ¶ 69.

## DISCUSSION

### I.    Legal Standards

#### A.  Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

On a Rule 12(b)(6) motion, courts generally disregard "matters outside the pleadings," though they "may consider those materials that are necessarily embraced by

the pleadings" such as "documents whose contents are alleged in a complaint and whose authenticity no party questions." *Hughes v. City of Cedar Rapids, Iowa*, 840 F.3d 987, 998 (8th Cir. 2016) (cleaned up); see also Fed. R. Civ. P. 12(d); *Hageman v. Barton*, 817 F.3d 611, 620 n.8 (8th Cir. 2016) (including "matters of public record" among the materials courts may consider on a Rule 12(b)(6) motion).

### B. Lack of Subject Matter Jurisdiction

On a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), courts must "consider whether a party is asserting a 'facial attack' or a 'factual attack' on jurisdiction." *Smith v. UnitedHealth Group Inc.*, 106 F.4th 809, 812 (8th Cir. 2024) (citing *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)). If the challenge is facial, courts consider the allegations in the pleadings and the plaintiff receives the same protections as he would on a motion for failure to state a claim under Rule 12(b)(6). *Id.* MAC's motion to dismiss presents only a facial attack on subject-matter jurisdiction, asserting that the facts alleged in the Complaint demonstrate the lack of standing for MSBCA to bring certain claims.

## II.    First Amendment Claim – Count I

MAC seeks dismissal of Plaintiff's First Amendment claim for lack of standing and failure to state a claim. After careful review, the Court finds that MSBCA has not demonstrated it has standing to pursue the First Amendment claim, and Count I of the Complaint is dismissed for lack of subject matter jurisdiction.

Under Article III of the U.S. Constitution, district courts have jurisdiction only over cases and controversies, and standing "is a threshold question that determines

whether a federal court has jurisdiction over a plaintiff's claims." *Agred Found. v. United States Army Corps of Engineers*, 3 F.4th 1069, 1073 (8th Cir. 2021) (citing U.S. Const. art III, § 2, and *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017)). When an organization, such as MSBCA, seeks to sue on behalf of its members, it "must demonstrate that '. . . its members would otherwise have standing to sue in their own right. . . .'" *Worth v. Jacobson*, 108 F.4th 677, 685 (8th Cir. 2024) (quoting *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard College*, 600 U.S. 181, 199 (2023)).[4]

For plaintiffs to meet their burden to demonstrate they have Article III standing, they must show they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation and citations omitted); *see also Carlsen*, 833 F.3d at 908 (same). "For causation to exist, 'the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Agred Found.*, 3 F.4th at 1073 (quoting *Lujan*, 504 U.S. at 560).

---

[4] An organization must also show "(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Worth*, 108 F.4th at 685 (quoting *Students for Fair Admissions*, 600 U.S. at 199). MAC does not challenge the MSBCA's organizational standing.

## A. Injury-in-Fact

"A plaintiff has suffered an injury-in-fact if he has experienced 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Carlsen*, 833 F.3d at 908 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff may demonstrate an injury-in-fact sufficient for Article III standing based on "intended future conduct [that] is arguably . . . proscribed" by the challenged government statute or conduct. *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (internal quotations omitted). However, the "threatened injury must be *certainly impending* to constitute injury in fact, and . . . allegations of *possible* future injury are not sufficient." *Id.* (quoting *Clapper v. Amnesty Int'l ISA*, 568 U.S. 398, 409 (2013)).

When a plaintiff makes a claim for prospective injunctive relief to protect its First Amendment rights, allegations showing one of two types of harm may demonstrate injury-in-fact. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016). Such a plaintiff can show standing if: (1) it alleges "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder'"; or (2) "by alleging that it self censored." *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) and citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)); *see also L.H.*, 111 F.4th at 893 (same).

MAC argues that MSBCA has alleged only hypothetical or conjectural injury. The Court agrees. MSBCA does not allege that its members have curtailed their speech in

response to the Labor Policy, nor that their speech concerning unionization or other employee organizing activities is currently chilled. *See L.H.*, 111 F.4th at 893 (identifying self-censorship as a First Amendment harm that can suffice for Article III standing purposes). Consequently, injury-in-fact cannot be established in this case through the First Amendment harm of self-censorship. *Id.* at 894–95 (explaining that plaintiffs made "no allegation that the[ir] . . . children have engaged in self-censorship to avoid punishment as a result of the District's automatic-removal policy").

Instead, the First Amendment harm identified in the Complaint is the allegation that the Labor Policy will eventually force MSBCA's members to adopt neutrality on employee organizing efforts through an arbitrator's decision. But this does not establish an injury-in-fact sufficient for Article III standing for several reasons. First, and most importantly, a neutrality agreement will not be foisted upon any MSBCA member unless and until a series of hypothetical events take place. To get to that end, one of MSBCA's members would first have to bid on and obtain a concession opportunity at the Airport in which MAC has chosen to include a labor peace requirement. Next, a labor organization would have to reach out to that concessionaire and seek to represent the employees, triggering the employer's obligation to negotiate a labor peace agreement with the labor organization. After that, the labor organization and the employer would have to be unable to negotiate a mutually-acceptable agreement on their own or through mediation. And finally, a dispute between the labor organization and the employer would have to go to arbitration, and after hearing from both sides, the arbitrator would have to exercise his or her discretion to include a neutrality provision in the labor peace agreement. Far from a

*certainly impending* First Amendment injury, these allegations show that any speech-related harm threatening the concessionaires is merely a *possible* future harm that could occur if this chain of hypothetical events plays out in this way. *See Clapper*, 568 U.S. at 409; *see also L.H.*, 111 F.4th at 894 (finding the plaintiff's failed to assert injury-in-fact because "for the automatic-removal policy to affect the children's conduct . . . a hypothetical, future challenge in which a book is automatically removed pending review must occur").[5]

Second, MSBCA does not contend that the terms explicitly required by the Labor Policy implicate any of its members' First Amendment interests. The only source of the alleged First Amendment harm in this case is the specter of a neutrality provision, but MSBCA concedes that the Labor Policy does not explicitly require a neutrality term in a

---

[5] MAC also raised the issue of ripeness in a footnote in its brief, Def.'s Mem. 7 n.4, and at the hearing, Plaintiff's counsel suggested that concerns over ripeness really implicated prudential standing considerations, *see* Hr'g Tr. 28–30. Ripeness is both part of Article III's case and controversy requirement *and* a prudential consideration. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 867 (8th Cir. 2013) ("The judicially created doctrine of ripeness flows from both the Article III cases and controversies limitations and also from prudential considerations for refusing to exercise jurisdiction.") (cleaned up), *enforced sub nom. Iowa League of Cities v. Env't Prot. Agency*, No. 11-3412, 2021 WL 6102534 (8th Cir. Dec. 22, 2021). And the issue of ripeness overlaps with the question of injury-in-fact presented here. *See id.* at 870 (quoting *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1138–39 (9th Cir.1999) (en banc) ("[I]n many cases, ripeness coincides squarely with standing's injury in fact prong.")); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (explaining that injury in fact and ripeness "boil[ed] down to the same question" in preenforcement challenge); *Inst. for Free Speech v. Ravnsborg*, 416 F. Supp. 3d 894, 902 (D.S.D. 2019) ("Ripeness often overlaps with the injury-in-fact requirement of standing, particularly when plaintiffs challenge a statute that has yet to be enforced against them."). Here, MSBCA's First Amendment claim is not ripe for the same reasons that MSBCA has failed to allege an imminent or certainly impending injury-in-fact.

labor peace agreement.[6] The terms that are mandated by the Policy—that employees agree not to picket, strike, engage in work stoppages, boycotts, or other forms of economic interference—do not prevent any MSBCA member from speaking about the benefits or drawbacks of worker unionization.

To be sure, the Court accepts as true MSBCA's allegation that it is common for labor peace agreements in the private sector in the Twin Cities area to include neutrality agreements. And the Labor Policy clearly provides that an arbitrator is empowered to fashion a labor peace agreement for a concessionaire and a labor organization that includes terms similar to those found in the private sector in the Twin Cities. But that does not mean that any MSBCA member faces an imminent invasion of a First Amendment interest through an arbitrator's imposition of a neutrality requirement. MAC's Policy still does not say that an arbitrator must impose a neutrality provision, while leaving the precise terms of the labor peace agreement coming out of any arbitration to the hypothetical arbitrator's discretion. Indeed, the Policy states that the arbitrator shall "fashion the terms of a Labor Peace Agreement similar to those occurring int the private sector in the Twin Cities metropolitan area *or which otherwise serve the proprietary interests of the MAC* in ensuring there are not strikes, work stoppages, picketing, boycotts or other economic interference" at the Airport. MAC Policy 10001 at 14 (emphasis added). Thus, the regular inclusion of neutrality agreements in private

---

[6] *See* Hr'g Tr. 30:1–4 ("THE COURT: Does the lease provision say anything about a neutrality agreement? MR. DELAQUIL: We think that is how the labor peace agreement will operate in the real world.").

sector labor peace arrangements in the Twin Cities area does not transform MSBCA's hypothetical injury into present or imminent harm.

MSBCA argues that it has demonstrated injury-in-fact because MAC's Labor Policy requires its members to engage in unwanted negotiations with labor organizations, at which its members are immediately placed at a disadvantage in those negotiations by the requirement of eventual arbitration. But this argument runs into two problems. The first the Court has already discussed—the imposition of any neutrality obligation that could implicate a concessionaire's right to freedom of speech is too conjectural. The second is the reality that "[w]hether a plaintiff has shown [an injury-in-fact] often turns on the nature and source of the claim asserted," which "means that a plaintiff's standing tracks his cause of action." *L.H.*, 111 F.4th at 893 (cleaned up). Here, MSBCA does not explain how engaging in compelled negotiations tracks its First Amendment cause of action. The only case MSBCA relies on to support the "unwanted negotiations" theory of injury-in-fact is *Airline Service Providers Association v. Los Angeles World Airports*, 873 F.3d 1074 (9th Cir. 2017) ("*LAX*"). But the *LAX* plaintiffs did not assert any First Amendment claim, so the *LAX* court's conclusion provides little guidance on whether compelled unwanted negotiations could suffice to demonstrate standing in this context.[7]

---

[7] At the hearing on the motion to dismiss, counsel for MSBCA suggested that requiring plaintiff's members to engage in unwanted negotiations could suffice as an injury-in-fact in the First Amendment context because such a requirement constitutes compelled speech. *See* Hr'g Tr. 30:6–37:5. This argument was not developed in the briefing and Plaintiff provided no case law to support it. Accordingly, the Court declines to consider it.

### B. Causation

The Airport also argues that MSBCA lacks standing for its First Amendment claim because the alleged harm requires intervening conduct by a third party—a hypothetical arbitrator who might include a neutrality agreement in a labor peace agreement. Def.'s Mem. 10–13. The Court finds that MSBCA has not plausibly alleged a First Amendment injury that is traceable to MAC's policy.

"For causation to exist, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *State v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022) (quoting *Agred Found. v. U.S. Army Corps of Engr's*, 3 F.4th 1069, 1073 (8th Cir. 2021)). The Eighth Circuit's decision in *State v. Biden* is instructive. At issue was then-President Biden's executive order requiring federal agencies to estimate the social costs of greenhouse gas emissions when conducting a cost benefit analysis that could be used in future regulation. 52 F.4th at 365. Several states sued to enjoin the order from taking effect, arguing that it would cause the states to suffer financial harm, but the court found that they lacked standing. *Id.* at 365–66. The court concluded that the states "fail[ed] to show the alleged injuries are caused by the interim . . . estimates" and explained that their "highly attenuated theory of injury [did] not satisfy [their] burden to show the requisite causation." *Id.* at 369 (explaining that the estimates had a "limited impact" that would occur "*if* agencies propose future regulations, *if* they conduct cost-benefit analyses for those regulations, and *if* they choose to monetize [greenhouse gas] emissions in those analyses, then the agencies must use the Interim . . . estimates").

Here, the theory of First Amendment injury involves an even more attenuated causal chain than that alleged in *State v. Biden*. The executive order at issue in *State v. Biden* explicitly required agency use of estimates if and when agencies performed cost-benefit assessments, but MAC's Labor Policy does not explicitly require any labor peace agreement to include a neutrality provision. As explained above, a whole string of "ifs" must become reality before a neutrality provision would be imposed. This means that the First Amendment injury alleged by MSBCA would only be attributable to the independent action of a third party not before the Court—a hypothetical arbitrator.

### C. Conclusion

In sum, because the allegations in the Complaint show neither an imminent, non-conjectural First Amendment injury, nor any such injury that is fairly traceable to MAC's own conduct, the Court concludes that MSBCA lacks standing to bring the First Amendment claim. Accordingly, the Court dismisses Count I of the Complaint without prejudice for lack of subject matter jurisdiction. Although MAC also moves to dismiss the First Amendment claim pursuant to Rule 12(b)(6), the Court's decision regarding standing makes it inappropriate to reach the merits of the First Amendment Claim.

### III.   NLRA Preemption Claim – Count II

MAC next seeks dismissal of the NLRA preemption claim in Count II of the Complaint for lack of standing and failure to state a claim. Recall that MSBCA alleges the Labor Policy is preempted by the NLRA because it conflicts with that statute's proviso that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, . . . shall not constitute or be evidence of an unfair labor practice. . ., if such

expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c); Compl. ¶ 53. The Labor Policy purportedly conflicts with § 158(c) because the Policy requires MSBCA's members to include neutrality provisions in labor peace agreements.

The Court finds MSBCA lacks standing to pursue its NLRA preemption claim, and does so for largely the same reasons that it lacks standing for its First Amendment claim. The NLRA claim likewise depends upon the allegation that the Labor Policy forces the concessionaires to enter labor peace agreements that contain neutrality requirements. And the facts alleged in the Complaint demonstrate that a neutrality provision only comes into play if a chain of hypothetical events take place. Such an injury is no less conjectural in the context of the NLRA claim—nothing in the Complaint suggests any member of MSBCA is imminently at risk of being subjected to a neutrality agreement against its will. Accordingly, the Court finds that MSBCA has failed to allege an injury-in-fact with respect to its NLRA preemption claim.

For this reason, the NLRA preemption claim in Count II of the Complaint is dismissed without prejudice for lack of standing. And the Court expresses no opinion on the merits of MAC's motion to dismiss Count II for failure to state a claim because it is dismissed for lack of subject matter jurisdiction.

## IV.    The ACDBE Regulation Claim – Count III

Defendant moves to dismiss Count III of the Complaint, which alleges that Defendant is violating the ACDBE regulation (49 C.F.R. § 23). Defendant argues that there is no private right of action for a party like MSBCA to enforce the ACDBE

regulation. The Court agrees that MSBCA has failed to state a claim in Count III of the complaint because there is no private right of action.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). That decision comes down to whether Congress intended to create a "private remedy" for enforcement of a statute, and if no such intent can be found, "a cause of action does not exist and courts may not create one. . . ." *Id.* at 286–87; *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 915 (8th Cir. 1997) ("The critical inquiry is whether Congress intended to create a private cause of action.") (quoting *Labickas v. Ark. State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996)). If a statute does not contain an express statement that it creates a private right of action, then the issue comes down to whether congressional intent to create such a right is implied. *Osher v. City of St. Louis, Mo.*, 903 F.3d 698, 702 (8th Cir. 2018) ("It is now clear that the proper focus is on congressional intent, and nothing short of an unambiguously conferred right will support an implied right of action.") (internal quotations removed). Courts cannot find an implied private right of action based only on the fact that a "statute intended to benefit the putative plaintiff." *Id.* (cleaned up); *see Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1208–09 (8th Cir. 2023) (explaining that statutes either "simply say when a private right of action is available" or imply such a private right of action exists because Congress has "*both* created an individual right *and* given private plaintiffs the ability to enforce it" as reflected in the "text and structure" of the statute).

The ACDBE regulation itself cannot be the source of any private right of action because the law is clear that only Congress, not federal agencies, may create such rights. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Alexander*, 532 U.S. at 291 (2001); *id.* ("[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Therefore, if MSBCA can sue to enforce provisions of the ACDBE regulations, the source of the private right of action must come from somewhere else.

The statute enabling the Federal Aviation Administration's creation of the ACDBE Regulation is the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. § 47107, *et seq.* In relevant part, the AAIA empowers the Secretary of Transportation to approve a grant application for an airport development project "if the Secretary receives written assurances, satisfactory to the Secretary, that the airport owner or operator will take necessary action to ensure . . . that at least 10 percent of all businesses at the airport selling consumer products . . . to the public are small business concerns . . . owned and controlled by a socially and economically disadvantaged individual. . . ." 49 U.S.C. § 47107(e)(1). The statute also provides that the Secretary must expend ten percent of available funds "with small business concerns owned and controlled by socially and economically disadvantaged individuals. . . ." 49 U.S.C. § 47113(b).

None of the AAIA's provisions expressly create a private right of action. And the Eighth Circuit has previously held that the statute does not create an implied private right of action. *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 916 (8th Cir. 1997). The *Four T's* court agreed with other circuit courts that "found none of the AAIA's provisions, including the requirement of various assurances of nondiscrimination, suggest the AAIA was intended to benefit nonaeronautical parties such as car rental concessionaires; the AAIA lacked language that could run in favor of private plaintiffs; and the AAIA's enforcement scheme did not suggest Congress intended to create a private right of action." *Id.* (citing *Nw. Airlines, Inc. v. Kent, Mich.*, 955 F.2d 1054, 1058–59 (6th Cir. 1992); *Interface Gr., Inc. v. Mass. Port Auth.*, 816 F.2d 9, 15 (1st Cir. 1997); *Arrow Airways, Inc. v. Dade County*, 749 F.2d 1489, 1490–91 (11th Cir. 1985); *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225 & n.4 (2d Cir. 1987)). MSBCA does not meaningfully distinguish *Four T's*. Because there is no express or implied private right of action under the AAIA, MAC's motion to dismiss Count III of the Complaint is granted.[8]

---

[8] In the reply brief in support of MAC's motion, it describes its challenge to Count III as a jurisdictional one. But "the general rule [is] that the lack of a cause of action does not deprive a federal district court of subject-matter jurisdiction." *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1217 (8th Cir. 2023). "[T]he absence of a federal cause of action has jurisdictional consequences . . . only when the claim is so obviously doomed to fail that there is no substantial question of federal law." *Id.* (cleaned up). Here, the Court simply dismisses the claim with prejudice for failure to state a claim, and not based on a jurisdictional flaw. However, this dismissal is not intended to preclude MSBCA from pursuing any administrative remedies that may be available, and the Court has made no determination that MAC has, in fact, complied with the ACDBE Regulations.

MSBCA nevertheless argues that the Court has equity jurisdiction to protect its members' rights under the ACDBE Regulation and award injunctive relief prohibiting MAC from enforcing the Labor Policy against those members in an allegedly discriminatory manner. *See* Pl.'s Mem. at 24–26. The Court is not persuaded that Plaintiff's invocation of equity jurisdiction applies here. To be sure, "federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–27 (2015) (citing *Osborn v. Bank of United States*, 9 Wheat. 738, 838–39 (1824); *Ex Parte Young*, 209 U.S. 123, 150–51 (1908)). But this doctrine does not authorize a private party to bring a federal lawsuit to obtain such injunctive relief when the public official has not "threatened to commence a civil or criminal enforcement action imminently. . . ." *Minn. Auto Dealers Assoc. v. Minn. ex rel. Minn. Pollution Control Agency*, 520 F. Supp. 3d 1126, 1134 (D. Minn. 2021). Here, the Complaint lacks any allegation that MAC is engaged in any ongoing enforcement of the Labor Policy against an MSBCA member, nor that such enforcement is imminent.

Still, MSBCA contends that the absence of an imminent enforcement action is no bar to having this claim heard by the Court in equity because the AAIA and the ACDBE Regulations do not have a significant remedial scheme that would foreclose equitable relief. Again, the Court disagrees. In another case in which an airport concessionaire sought relief for an alleged violation of a provision of the ACDBE Regulations, the court concluded that "it does not appear that a district court has any role to play in adjudicating alleged violations" of the ACDBE program for a variety of reasons. *MCS Burbank, LLC*

*v. Raleigh-Durham Airport Auth.*, No. 5:24-CV-00255-M, 2024 WL 3223666, at *3

(E.D.N.C. May 3, 2024). As explained by the *MCS Burbank* court:

> Several enforcement mechanisms apply in this FAA program, including (1) the withholding of approval for project grant applications, (2) the withholding of payments under project grant agreements, and (3) investigations and public hearings. *See* 49 C.F.R. § 26.105(a) (incorporating by reference the enforcement mechanisms in 49 U.S.C. § 47106(d), 49 U.S.C. § 47111(d), and 49 U.S.C. § 47122). Compliance audits are also available to the FAA. *See* 49 C.F.R. § 26.105(b) (incorporating by reference 49 C.F.R. § 26.103(b)). Lastly, and most critically in this case, "[a]ny person who knows of a violation of this part by a recipient of FAA funds may file a complaint under 14 CFR part 16 **with the Federal Aviation Administration Office of Chief Counsel**." 49 C.F.R. § 26.105(c) (emphasis added).
>
> 14 C.F.R. part 16 lays out an exhaustive administrative enforcement regime, including rules governing complaints, prehearing conferences, discovery, depositions, witnesses, subpoenas, evidence, hearings, and more. *See* 14 C.F.R. §§ 16.1 – 16.245. At the conclusion of those administrative hearings, "[a] person may seek judicial review, in a United States Court of Appeals, of a final decision and order" from the FAA's Director or Associate Administrator. 14 C.F.R. § 16.247(a). This lengthy administrative process has been well-summarized. *See Skydive Myrtle Beach Inc. v. Horry Cnty. Dep't of Airports*, 735 F. App'x 810 (4th Cir. 2018).
>
> . . . . If [a party is] aggrieved by the outcome of . . . proceedings [before the FAA's Office of Chief Counsel], the person may then seek appellate review in a Court of Appeals. 14 C.F.R. § 16.247(a).

*Id.* at *2–3. Contrary to MSBCA's contention, using the Court's equity jurisdiction to

hear its ACDBE claim and provide its members with injunctive and declaratory relief

would allow it to end-run the congressional choice for administrative, rather than private

enforcement of the program. *Armstrong*, 575 U.S. at 328 (explaining that the plaintiff

could not "by invoking our equitable powers, circumvent Congress's exclusion of private enforcement").

For these reasons, Defendant's motion is granted as to Count III.

## V.    LMRA Section 302 Claim – Court IV

In Count IV of the Complaint, MSBCA alleges that if its concessionaire members enter into labor peace agreements as required by the Policy, they will violate Section 302 of the Labor-Management Relations Act ("LMRA"). Section 302 makes it a federal crime for an employer "to pay, lend, or deliver, any money or other thing of value" to a labor union, union official, or employee to influence labor relations decisions, 29 U.S.C. § 186(a)(1)–(4), (d). Because MSBCA claims that a labor peace agreement is a thing of value that its members would be providing to labor unions in an effort to comply with the Policy, the Policy violates the LMRA and MAC should be enjoined from enforcing it. MAC argues that Plaintiff's Section 302 claim should be dismissed because: (1) Section 302 does not criminalize labor peace agreements; and (2) even if it did, there is no private right of action to enforce Section 302.

The Court finds that this claim also must be dismissed because there is no private right of action. There is no language in the statute creating an express right of action. "Nothing in § 302 says that private parties may enforce the law[, and] [t]he relevant language imposes federal criminal penalties on parties who willfully violate the statute. . . ." *Ohlendorf v. United Food & Com. Workers Int'l Union, Local 876*, 883 F.3d 636, 640 (6th Cir. 2018). Criminal punishment is "usually enforced by the federal government, not private parties," and the penalty provision "says nothing about civil

25

remedies." *Id.*; *Donegal Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*, No. 20 C 1990, 2020 WL 5994464, at *4 (N.D. Ill. Oct. 8, 2020) (following *Ohlendorf*). Nor is there an implied private right of action in Section 302. *Ohlendorf*, 883 F.3d at 641–42 (explaining that Section 302 "does not say about the individuals protected or their capacity to file a lawsuit under the . . . standard of criminal liability . . . created" and reasoning that no congressional intent to imply a right of action should be found for Section 302 where the surrounding provisions in the LMRA create private remedies for other violations). Again, MSBCA points to nothing in the language or structure of the statute that supports the recognition of an express or implied private right of action.

MSBCA's opposition to the motion to dismiss again invokes the Court's equity jurisdiction. Although federal courts have jurisdiction to restrain violations of Section 302, 29 U.S.C. § 186(e), that does not create a private right of action. *See Ohlendorf*, 883 F.3d at 642–43 (explaining that the Attorney General can bring an action to restrain violations of the statute, and courts can enjoin violations "in lawsuits brought under express private rights of action, as a needed exception to the Clayton Act and the Norris-LaGuardia Act's ban on labor-dispute injunctions"); *Volvo Grp. N. Am., LLC .v Int'l Union United Auto. Aerospace & Agric. Implement Workers of Am. (UAW)*, 451 F. Supp. 3d 570, 576 (W.D. Va. 2020) (same, following *Ohlendorf*). MSBCA's remaining arguments regarding the absence of a private right of action are unconvincing. Count IV of the Complaint is, therefore, dismissed with prejudice for failure to state a claim. *Donegal Servs., LLC*, 2020 WL 5994464, at *4 n.1 (dismissing the LMRA section 302 claim with prejudice under Rule 12(b)(6) where there was no private right of action).

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1.      Defendant's Motion to Dismiss is **GRANTED**.

2.      Counts I and II of the Complaint are dismissed without prejudice for lack of standing.

3.      Counts III and IV are dismissed with prejudice for failure to state a claim.

**Let Judgment be entered accordingly.**

Date: May 5, 2025                          *s/Katherine Menendez*
                                      _____
                                      Katherine Menendez
                                      United States District Judge